**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)**

| | |
|---|---|
| SANTIAGO E. CARTAGENA ) | CIVIL ACTION NO. |
| ) | |
| Plaintiff ) | 3:03 CV 998 (JGM) |
| ) | |
| vs. ) | |
| ) | |
| THAMES VALLEY WATER BOTTLING ) | |
| COMPANY, INC. ) | |
| ) | |
| Defendant ) | |

## EXHIBIT B

```
 1                    UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF CONNECTICUT
 3
 4
 5   SANTIAGO E. CARTAGENA            )    CASE ACTION NO.
 6
 7
 8   VS.                              )    303 CV99(JBA)
 9
10
11   THAMES VALLEY WATER BOTTLING CO., INC.  )  FEBRUARY 26, 2004
12
13
14
15              DEPOSITION OF SANTIAGO E. CARTAGENA
16
17
18
19                            COPY
20
21
22
23              Victoria L. Germani, R.P.R., C.S.R.
24                          LSR NO.051
                          Shea & Driscoll
25                  Court Reporting Associates
                        16 Seabreeze Drive
                   Waterford, Connecticut 06385
```

*Shea & Driscoll Court Reporting Associates*

1  upon that position that the -- you know.
2         And I gladly went forth doing so.
3  Q    And later on after you had filled out the application,
4  after you had interviewed, who was the one that came to you to
5  say, congratulations, you have a job at Manitock?
6  A    The Mayor came in the picture soon after I talked to
7  Mr. Chism, the Affirmative Action Officer for the City of
8  Groton.
9  Q    So Alex Chism was the first one to tell you that you
10 had the job at Manitock; not just the initial discussion, we're
11 talking about the one saying you've gotten through the interview
12 process, congratulations, you have a job?
13 A    I would have -- Again, I would have to say Mr. Mike
14 Cavanagh and Mr. -- Mayor Dennis Popp both at the same time.
15 Q    Were they both in the room at the same time?
16 A    No.  But they were in communication with each other
17 because the company was very new, that they just acquired, so
18 they needed help.
19         So again, I was honored to do that, to go there.
20 Q    What did Mike Cavanagh say when he was telling you
21 essentially, congratulations, you have a job?  What words did
22 he use, the best you can recall?
23 A    (Pause.)  Just come to -- come in -- I believe it was
24 the next day, to come into work.  And that gave me a warm
25 welcome as far as that started the congratulations.

*Shea & Driscoll Court Reporting Associates*

Case 3:03-cv-00998-JGM   Document 17-2   Filed 04/30/2004   Page 3 of 18

1  Q  When you made the complaint against Sally's Beauty
2  Supply, did you claim that they were discriminating against you
3  because you were Hispanic?
4  A  That was a situation that turned out to be a harassment
5  and threatening issue. I don't believe I stated that.
6  Q  You understand that the Commission on Human Rights and
7  Opportunities handles discrimination claims; is that right?
8  A  Correct.
9  Q  Did you make a claim of discrimination to the
10 Commission on Human Rights against Sally's?
11 A  Again, I don't recall. It was awhile back. If I did,
12 it would have been -- I was the only worker as far as the --
13 male Hispanic.
14 Q  Going back to the time period of July or August of two
15 thousand, if you could recall the date or approximately when,
16 when did you first have discussions about what would be the
17 terms of employment at Manitock?
18 A  Again, I believe the question -- how I got employed?
19 Q  When did you start having discussions about what the
20 deal would be?
21 A  With the Mayor? When? Right, with Mayor Dennis Popp.
22 Q  Would that have been in July or August of two thousand?
23 A  That would have been -- Let me see. I think I
24 transferred in August. So that would have been a month before
25 that. July, yes.

*Shea & Driscoll Court Reporting Associates*

Case 3:03-cv-00998-JCM   Document 17-2   Filed 04/30/2004   Page 4 of 18

1    would be fired?
2        A    (Pause.)  Would you repeat that, please.
3        Q    Sure.  Were you ever told anything about what's called
4    progressive discipline; that is, the workers at Manitock have --
5    get a certain number of, like, verbal warnings before they would
6    get written warnings, et cetera?
7        A    No.
8        Q    And if you recall, what was the first day that you
9    started work at Manitock?
10       A    I believe it -- I believe Monday.  It would have been a
11   Monday.
12       Q    Was that the end of August?
13       A    Correct.  Yes, I believe so.
14       Q    Last Monday in August?
15       A    I believe so.
16           MR. PASCAL:  Off the record.
17           (Off the record.)
18   BY MR. PASCAL:
19       Q    Who did you report to on the first day you started work
20   at Manitock?
21       A    To Mr. Cavanagh, Mike Cavanagh, General Manager.
22       Q    And on that day what did he tell you that you would be
23   doing as your first job at Manitock?
24       A    I would be going out with Mr. Mike Dunbar for the route
25   as far as, you know, how to go about dispensing the water

```
 1              I could have done it from my truck that I was driving,
 2     sure; but it -- again, you would only cause -- you know, an
 3     empty truck, so to say, on a small route.  It's better to have a
 4     full truck.
 5              (Off the record.)
 6              (Defendant's Exhibit No. 3, three checks, was marked
 7         for identification.)
 8     BY MR. PASCAL:
 9         Q    I show you what's been marked Exhibit 3 and ask if you
10     recognize any of these documents?
11         A    (Pause.)  Yes.
12         Q    What are these documents?
13         A    My paychecks, my payroll checks issued to me from
14     Thames Valley Water Bottling Company.
15         Q    Who did you understand your employer to be?
16         A    I'm sorry?
17         Q    Who did you feel was your employer?
18         A    Groton City.
19         Q    Even though the check said Thames Valley Water Bottling
20     Company?
21         A    Correct.  I wasn't aware of that; but our bosses were
22     Groton City officials, correct.
23         Q    When you worked at the City Highway Department, were
24     the workers who had been there longer part of a union?
25         A    Yes.
```

*Shea & Driscoll Court Reporting Associates*

1    found out about your wanting to unionize?

2        A    Yes, yes.

3        Q    Do you think Mike Cavanagh in particular found out?

4        A    Oh, yes.  I felt the impact personally.

5        Q    What did Mike Cavanagh say or do to give you that

6    impact?

7        A    Again, my -- my pay was regulated.

8            My route dispensing of the waters were very, very much

9    regulated.

10           I was the last one to get any forecast of what was

11   ahead of me while the other drivers knew, you know, on a set

12   route basis what they would encounter.  I didn't.

13           I had to always wait till the last minute during the

14   day to know how many bottles to start loading up; what to do;

15   where to deliver; how to go about, you know, just doing the

16   transactions on a daily basis.

17       Q    And that went --

18       A    And that went along to Mr. Sean Mazzarella.

19       Q    Who was your direct supervisor?

20       A    Later on in the picture, yes.  Who adamantly took

21   orders from Mr. Cavanagh to treat me the way he treated me.

22       Q    Do you think Sean Mazzarella knew about your trying to

23   unionize?

24       A    Yes.

25       Q    Did you ever discuss it with him?

*Shea & Driscoll Court Reporting Associates*

1    A    Yes. And there was another driver before him that took
2    my truck. And again, I couldn't say or do anything.
3    Q    Who was the other driver?
4    A    He had a -- He was involved, I think, in a car
5    accident, I believe, or a broken leg, something like that. He
6    was -- He wasn't there long to perform.
7    Q    Was it Todd Choti, in fact, who broke his leg?
8    A    No, no. There was another driver before Todd.
9    Q    Who do you feel was making decisions at Manitock that
10   were against your interests?
11   A    Mr. Cavanagh, Mike Cavanagh.
12   Q    When you didn't have truck number three at the times
13   when somebody else was using it, what did you have to drive
14   with?
15   A    Again, a lot of times I would be in the warehouse as a
16   form of punishment; or if I did, I'd go to -- to do a few stops
17   on the van, which wasn't much.
18        Again, I'm working on commission. And when I didn't
19   work from either van or truck, I worked in the warehouse, which
20   I don't recall if I had to punch in or out. Again, it got
21   confusing.
22   Q    How often did you work in the warehouse after the time
23   you got your CDL?
24   A    He put me in there for, I would say, quite a few times.
25   Q    At least one day a week?

*Shea & Driscoll Court Reporting Associates*

1      Q    And was it the same truck he continued to use when he
2 was at the casino as he had used at New Haven?
3      A    Yes.
4      Q    Did you ever complain to David Guthrie about the way
5 Mike Cavanagh was treating you?
6      A    Yeah.  I complained to him, yes.  He also, as you know,
7 felt it was wrong and so -- to the impact [sic].
8      Q    Did he ever suggest to you you should do something
9 about it?
10     A    No.
11     Q    Another person working there was Barbara Hammond --
12     A    Correct, secretary.
13     Q    A secretary.  What was her job?  Who did she work with?
14     A    She worked with the lady that signs the checks.  What's
15 her name?
16     Q    Grace --
17     A    Grace -- Grace --
18     Q    -- Perkins?
19     A    -- Perkins, correct.  And Mary, and with Carolyn, and
20 Barbara; they all worked upstairs.
21     Q    Did you have much in the way to do on a regular basis
22 with Barbara Hammond on the job?
23     A    (No response.)
24     Q    Did you have any occasion to talk with Barbara on a
25 regular basis as part of your job?

*Shea & Driscoll Court Reporting Associates*

Case 3:03-cv-00998-JGM   Document 17-2   Filed 04/30/2004   Page 9 of 18

1    Q    Did Adam Martin ever get his CDL while you were there?

2    A    No. Unfortunately not, no. He failed the test.

3    Q    Next I'll mention Sean Mazzarella. He was your direct
4  supervisor?

5    A    He was the warehouse manager, yes.

6    Q    Did he have anything to do with assigning routes as
7  well?

8    A    I don't believe so. Again, everything had to be
9  initiated from Mr. Cavanagh on a daily basis as far as for me
10 goes.

11        Sean came in the picture later on in time. He was only
12 there quite a few months. I've been there much longer than him.

13   Q    He came in around April, didn't he, of two thousand
14 one?

15   A    Correct. Probably so, yes.

16   Q    Was Sean part of the problem, or was it limited to Mike
17 Cavanagh?

18   A    I would have to say yes, because he was only taking
19 orders from Mike Cavanagh. So he wasn't really -- in a way
20 managing or directing; he just handed the paperwork to me.
21 Anybody could do that.

22   Q    Yes. But was he -- I don't know, did he ever belittle
23 you or mistreat you, you know, more personally?

24   A    Belittle me, yes. There was times when -- as far as he
25 would state or make sarcastic comments to -- that I would only

*Shea & Driscoll Court Reporting Associates*

1    what you disagree with?
2        A    Number two, --
3        Q    And what do you feel is different?
4        A    -- number three.
5        Q    Well, let's do one at a time. What do you feel is not
6    true about what's said in this affidavit in paragraph two?
7        A    Sean states that he was responsible for my -- managing
8    the drivers, which is not so true. The drivers already knew
9    their position.
10            I was the only one that he needed to always have
11   contact with due -- through Mike Cavanagh.
12       Q    Did Sean hand you the driving assignments?
13       A    That's correct.
14       Q    Did he hand the driving assignments to the other
15   drivers as well?
16       A    No. It's like a cubby thing; or they go up to a table.
17   You see papers scattered. That's the way their paperwork is
18   already set for them.
19       Q    How about for other fill-in drivers like Adam Martin,
20   wouldn't he need to get a more specific assignment?
21       A    They would have to set it up for him. They would have
22   to start making up.
23       Q    So just like for you, --
24       A    Correct.
25       Q    -- you said you would get the slips from Sean. Adam

1  recall in the winter months, January, February, you said of two
2  thousand one; were there any other customers that you would see
3  on a biweekly basis?
4      A    (Pause.)  I don't recall.  Maybe.  Again, it depended
5  on my -- my boss, Mr. Cavanagh, where -- what stops I had.
6           I wasn't sure, you know, to be exact -- to be positive
7  how my route's going to turn out to be.
8      Q    Is there anything you disagree with in paragraph five
9  of Exhibit 7?
10     A    I disagree the whole -- Yes.
11     Q    With what?  This paragraph?
12     A    It states, Sam liked to talk.  I mean, they know my
13 name very well, it's Santiago.  For some odd reason they want to
14 call me Sam.  I guess that's okay.
15          If I like to talk, there's -- I don't think there's a
16 law against not -- I mean, not to talk.
17     Q    Did you regularly go by the name Sam or Santiago when
18 you worked there at Manitock?
19     A    Santiago.
20     Q    Did anybody call you Sam?
21     A    I think Mike Dunbar did, Mike Cavanagh, Paul, Barbara,
22 Grace.
23     Q    This affidavit in paragraph five refers to your
24 arriving after four thirty closing time.
25     A    Correct.

*Shea & Driscoll Court Reporting Associates*

1  off in the summer of two thousand one that you had not done in
2  the winter and spring of two thousand one?
3      A    There were some.
4      Q    What were those so-called new cities that you were
5  delivering bottles?
6      A    I don't know if they're called new cities. I think you
7  mean new towns or roads.
8      Q    (Nodded head affirmatively.)
9      A    Right, there was plenty of them. I have to look on a
10 map. I have to ask my co-workers that had that route. And by
11 that time, they're gone; there's no chance to ask them. I have
12 to start looking at the map.
13     Q    Give me an example of --
14     A    Roads, certain roads -- like Horse Pond Road, I think
15 there's one in the Madison area; that's a large road. And it
16 has a connector, new developments; and they're really far.
17          And I'm talking going toward south -- ninety-five
18 south, these new developments that I have to start looking for,
19 stopping and asking questions.
20     Q    Is it true what Sean says here, that he gave you
21 multiple verbal warnings --
22     A    No.
23     Q    -- about driving late and arriving late and about
24 returning without delivering everything?
25     A    No. He would get -- Sean would get wind from Mike to

*Shea & Driscoll Court Reporting Associates*

1  scold me.
2          Like I said it earlier, that's how that chain of
3  command was conducted.
4     Q    And how often would he scold you?
5     A    Quite often when they weren't satisfied with my
6  performance.
7     Q    And when did that begin?
8     A    I would say as soon as Sean got in the picture; because
9  I noticed that, you know, here's Sean trying to be an office --
10 or warehouse manager, if that was his title. He just took on
11 orders from Mike. And that's how I felt the impact.
12    Q    So you feel they were not satisfied with your
13 performance since April of two thousand one when Sean Mazzarella
14 first came to the company?
15    A    Well, in the beginning, you know, we're acquainting
16 ourselves. And Sean knows and saw me, that I worked very hard.
17         And I have always begged for more water, more stops.
18 And he at times would give it to me. But then he would get
19 scolded from Mike, why did you give it to him without talking to
20 me first? And so that's when his demeanor changed on me.
21    Q    How do you know Mike Cavanagh was scolding Sean? Did
22 you overhear it?
23    A    It's very -- You could see it. You could probably ask
24 all the people -- what people you're mentioning, all those
25 names, yes.

*Shea & Driscoll Court Reporting Associates*

1    what was in the water was Mike Cavanagh?
2         A    Did I identify it?
3         Q    Yes. Didn't you basically say that Sean treated you
4    based on what he had been told to do by Mike Cavanagh?
5         A    Correct, yes.
6         Q    Another person who worked at Manitock you named, I
7    believe, was Grace Perkins?
8         A    Okay.
9         Q    What was her position at the company?
10        A    She was another manager, office manager, I believe.
11   She would backup, I guess, Mike Cavanagh's decision-makings, you
12   know, executive decisions, you could call it, I guess.
13        Q    Did you have any direct dealings with Grace Perkins?
14        A    Yes, I did.
15        Q    And how was she to deal with?
16        A    At first for a few months she was very nice, cordial,
17   likewise.
18             And then when I lost -- misplaced a check, I approached
19   Miss Perkins about it. And it seemed to me that she didn't
20   care.
21             And I then went to Groton City to inquire about my
22   check. And I believe I also called to no avail. They wanted me
23   to pay them twenty dollars to give me -- to re-issue me a new
24   check.
25        Q    Who is "they"?

1   Q   Were they, relatively speaking, always short of
2   drivers?  With the turnover, they never had enough help?
3   A   I don't know.
4   Q   Did you call in sick?
5   A   Yes, I did.
6   Q   What did you have that day, what kind of condition that
7   you were not able to work?
8   A   I believe I had a cold.
9   Q   And who did you call to say you were sick?
10  A   I talked to Sean.  I think it was at six o'clock.
11  Q   And what did you say to Sean?
12  A   Sean, I won't be able to make it today, I'm not feeling
13  well.
14  Q   And what did he say?
15  A   And he said okay.
16  Q   What else did he say?
17  A   (Pause.)  I hope you get better, and that was it, hung
18  up.  Then he calls me right back.
19  Q   Tell me what you recall of that conversation.
20  A   To come and get your Pink Slip or something, paperwork,
21  that you're terminated.  I said, what?  So I just listened to
22  that.
23  Q   Did you ask him why?
24  A   No.
25  Q   Why not?

*Shea & Driscoll Court Reporting Associates*

1   I kind of sensed that because he didn't really -- I
2   felt that he didn't really want to do it. Again, this goes
3   along the line of command from Mike Cavanagh to Sean.
4   In other words, he was -- his demeanor wasn't happy.
5   He was saddened.
6   Q   Did he say anything to give you the impression or just
7   -- what were you relying on to believe it originated with Mike
8   Cavanagh?
9   A   Because I -- Sean, I don't believe has that heart or
10  ruthless to act like that. He knows that all of us work very
11  hard -- at least I did. And for this to come down on me like --
12  like a bomb-- it was a bomb. It took a crisis in my life. To
13  this day I'm suffering.
14  Q   Well, we're going to talk about that as well.
15  In the time you were there from August, two thousand,
16  to August, two thousand one, you saw that certain other
17  employees' employment had been terminated; is that correct?
18  A   I saw some.
19  Q   So for example, Adam Jackson?
20  A   Okay, right. Yes, he was -- as a matter of fact, he
21  took the -- the route that I should have had; correct.
22  Q   He was terminated, I believe, June eighteenth, two
23  thousand one. Does that seem correct to you?
24  A   That sounds -- Yes.
25  Q   Okay. To your knowledge why was Adam Jackson

*Shea & Driscoll Court Reporting Associates*

CERTIFICATE OF REPORTER

I, Victoria L. Germani, RPR, LSR, and Notary Public duly commissioned and qualified within and for the State of Connecticut; do hereby certify that pursuant to Notice there appeared before me on the 26th day of February, 2004, at 10:00 a.m. the following named person, to wit: SANTIAGO E. CARTAGENA, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath; and his examination reduced to writing under my supervision; and that the deposition is a true record of the testimony given taken to the best of my ability.

I further certify that I am neither attorney nor counsel for, nor related to nor employed by any of the parties to the action in which this deposition is taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my Notarial Seal this 23rd day of March, 2004.

_____
Victoria L. Germani, Notary Public
LSR NO.051
My Commission expires April 30, 2005

(SEC:vlg)

*Shea & Driscoll Court Reporting Associates*